700 F.2d 1339
 31 Fair Empl.Prac.Cas. 517,
31 Empl. Prac. Dec. P 33,455
Melvin FREEMAN, for Himself and for all others similarly
situated, Plaintiffs-Appellants, Cross-Appellees,
v.
MOTOR CONVOY, INC., et al., Defendants-Appellees, Cross-Appellants,
v.
Douglas Spencer, Intervenor-Appellant.
 No. 81-7644.
 United States Court of Appeals,
Eleventh Circuit.
 March 21, 1983.
 
 1
 John R. Myer, Atlanta, Ga., for plaintiff-intervenor.
 
 
 2
 Clyde E. Murphy, New York City, for plaintiffs-appellants.
 
 
 3
 Jones, Bird & Howell, Alexander E. Wilson, III, Forrest W. Hunter, Atlanta, Ga., for Motor Convoy Inc.
 
 
 4
 Roland P. Wilder, Jr., Washington, D.C., for Int. Broth. of teamsters.
 
 
 5
 Frederick C. McLam, Decatur, Ga., for Teamsters Local Union No. 528.
 
 
 6
 Appeals from the United States District Court for the Northern District of Georgia.
 
 
 7
 Before HILL and CLARK, Circuit Judges, and SCOTT*, District Judge.
 
 CHARLES R. SCOTT, District Judge:
 
 8
 Plaintiff Melvin Freeman, a black employee, brought this action against his employer, Motor Convoy, Inc., and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers (hereinafter 'Teamsters International') and Local 528, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers (hereinafter 'Local 528'), alleging racial discrimination in employment in violation of Title VII of the Civil Rights Act of 1964 (hereinafter 'Title VII'), 42 U.S.C. Sec. 2000e et seq., and the Civil Rights Act of 1866 (hereinafter 'Section 1981'), 42 U.S.C. Sec. 1981. Motor Convoy is an interstate carrier of motor vehicles with its main office located in Atlanta, Georgia. The complaint alleges that Motor Convoy discriminated against black employees at its Atlanta, Georgia and Birmingham, Alabama terminals. Local 528 of Teamsters International is the exclusive bargaining representative of the Company's employees at the Atlanta facility.
 
 
 9
 The job classifications at Motor Convoy fall into three major categories: drivers, shop employees and yard employees.[1] The positions in the shop department include welder-mechanic, mechanic, advanced apprentice mechanic, helper, greaser and tire man. The yard department positions include janitor, porter and washer. The driving, welder-mechanic and mechanic positions are the most desirable and highest paying jobs.
 
 
 10
 The employees of Motor Convoy are covered by the National Masters Automobile Transporters Agreement and the Central and Southern Conference Supplemental Agreements. The National Agreement authorizes the local unions to establish a seniority system. Prior to 1976, the seniority system under the Central and Southern Conference Supplemental Agreement provided that an employee who transferred to another job classification would forfeit the seniority rights he had acquired in his former job classification. Consequently, an employee could not carry over his seniority upon transferring to another position.
 
 
 11
 Plaintiff Freeman initially filed charges with the Equal Employment Opportunity Commission (hereinafter 'EEOC') alleging that Motor Convoy discriminated against black employees in violation of Title VII. Upon receiving notification of his right to sue, plaintiff Freeman brought this action alleging that Motor Convoy had engaged in a pattern or practice of racial discrimination in violation of Title VII and Section 1981 by assigning black employees to the lower paying and less desirable jobs, denying black employees transfers or promotions to higher paying jobs, and denying black employees over-time work and on-the-job training. In addition, the complaint alleged that Motor Convoy and the defendant unions violated Title VII and Section 1981 by negotiating and maintaining collective bargaining agreements which did not allow transfers with full carry-over seniority. With respect to his individual claim, plaintiff Freeman alleged that although he had performed the duties of a mechanic since July 2, 1965, he was not classified as a mechanic and did not receive the pay rate of a mechanic until January 10, 1970. Furthermore, plaintiff Freeman alleged that the transfer restrictions in the collective bargaining agreement prevented him from obtaining a driving position.
 
 
 12
 Douglas Spencer, a black employee, filed similar charges of discrimination with EEOC and, following notification of his right to sue, intervened. In addition to the allegations set forth in plaintiff Freeman's complaint, Spencer alleged that Motor Convoy engaged in a pattern or practice of racial discrimination in hiring black employees only for lower paying jobs and hiring white employees while qualified black employees were on layoff status. With respect to his individual claim, Spencer alleged that he had been assigned to lower paying jobs and had been "bumped" on several occasions by white employees who had previously held higher paying jobs but had less seniority. Spencer further alleged that while he was laid off, vacancies existed in higher paying and more desirable job classifications for which he was qualified.
 
 
 13
 The district court certified the case as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure and defined the class as "all black employees of Motor Convoy, Inc., excluding office and supervisory personnel, who are employed, or were employed and have been discharged or laid off since July 2, 1965, within the Southern Conference of Teamsters." 68 F.R.D. 196, 203 (N.D.Ga.1974).[2] The certified class included employees at the Company's terminals in Atlanta, Georgia and Birmingham, Alabama.
 
 
 14
 Following a non-jury trial on the issue of liability, the court entered an order on December 11, 1975. 409 F.Supp. 1100 (N.D.Ga.1976). The court determined that the relevant statistical evidence corroborated by the testimony of certain employees established a prima facie case of racial discrimination.[3] Concluding that Motor Convoy had failed to produce sufficient rebuttal evidence, the court held that Motor Convoy had violated Title VII and Section 1981 by engaging in a pattern or practice of racial discrimination in hiring, assigning jobs and providing on-the-job training. The district court further found that the collective bargaining agreements which prohibited transfers with carry-over seniority perpetuated the effects of the Company's discriminatory employment practices by discouraging black employees from seeking transfers to the higher paying and more desirable jobs. Accordingly, the court held that Motor Convoy and the defendant unions were jointly and severally liable under Title VII and Section 1981 for the discriminatory effects of the seniority system incorporated in the collective bargaining agreements.
 
 
 15
 The district court granted plaintiffs immediate injunctive relief by enjoining Motor Convoy from further engaging in any unlawful employment practices. The court also ordered Motor Convoy to provide each member of the class an opportunity to transfer with full carry-over seniority to another job classification when a vacancy occurred for which the class member was qualified. Finally, the court established procedures for the remedial phase of the case.
 
 
 16
 Shortly after the entry of the December 11, 1975 court order, Article 26 of the National Agreement was amended as follows:
 
 
 17
 In those terminals where classification seniority applies, the parties agree that in filling vacancies with qualified employees which occur subsequent to the execution of this Agreement, the principle of carry-over terminal seniority shall be recognized. In the event that the Employer and the Local Union fail to formulate a Ryder which provides for the filling of vacancies consistent with the foregoing provision, the Joint Area Committees shall have such authority.
 
 
 18
 In implementing this provision, Motor Convoy and Local 528 agreed to a plan which provided for a one-time transfer with carry-over seniority for each employee to any position for which the employee was qualified. The one-time transfers took place in September of 1978. Thereafter, the plan provided that all transfers to fill permanent vacancies would be with full carry-over seniority.
 
 
 19
 Defendants filed an interlocutory appeal from the district court's order of December 11, 1975. The case, however, was remanded for further consideration in light of the intervening decision of the Supreme Court in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The Court in Teamsters concluded that "the unmistakable purpose of Sec. 703(h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII." Id. at 352, 97 S.Ct. at 1863. The Supreme Court, therefore, held that "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." Id. at 353-354, 97 S.Ct. at 1863-1864. Consequently, under Teamsters the fact that a seniority system has a discriminatory effect is by itself an insufficient basis for finding liability. Rather, a showing of a discriminatory purpose in negotiating and maintaining the seniority system is required.
 
 
 20
 On remand, the district court determined that additional findings of fact were necessary to determine whether the defendant unions were absolved from liability in light of Teamsters. However, the court concluded that Teamsters did not affect Motor Convoy's liability and adhered to its original finding that the Company had engaged in an unlawful pattern or practice of discrimination against black employees. The district court vacated its original order of December 11, 1975 and referred the case to a Special Master to determine whether the seniority system was bona fide under Section 703(h) of Title VII in light of Teamsters. In addition, the Special Master was instructed to determine which members of the class were entitled to individual relief and whether general injunctive relief was warranted.
 
 
 21
 Following an evidentiary hearing, the Special Master filed his report which was subsequently approved and adopted by the court. The district court found that the seniority system was facially neutral and had not been negotiated or maintained for a discriminatory purpose. The court, therefore, held that the seniority system was bona fide under Section 703(h) as construed by Teamsters. Accordingly, the defendant unions were exonerated from liability.
 
 
 22
 In light of the changes that had been made by the Company and defendant unions since the court's original order of December 11, 1975, the court concluded that general injunctive relief was unnecessary. The court awarded complete or partial individual relief to plaintiffs Hugh Brooks, Sam Freeman and Willie Samuels and denied the individual claims for relief of the other eight class members. Plaintiffs were awarded attorneys' fees.
 
 
 23
 On appeal, plaintiffs contend that the district court erred in failing to include black applicants within the class, in finding that the defendant unions were not liable for the discriminatory effects of the seniority system and in finding that certain class members were not entitled to complete individual relief. Defendants have filed a cross-appeal arguing that the district court erred in granting individual relief to Hugh Brooks and Sam Freeman and in determining the amount of attorney's fees to be awarded to plaintiffs. The specific issues presented on appeal are as follows:
 
 
 24
 1. Whether the district court erred in failing to include black applicants for employment within the certified class.
 
 
 25
 2. Whether the district court erred in applying Section 703(h) of Title VII to the seniority system's coverage of the Atlanta shop and yard employees.
 
 
 26
 3. Whether the district court erred in applying Section 703(h) of Title VII to plaintiffs' claims under Section 1981.
 
 
 27
 4. Whether the district court erred in requiring proof of intent to discriminate with respect to plaintiffs' claims under Section 1981.
 
 
 28
 5. Whether the district court erred in denying additional equitable relief based upon plaintiffs' Section 1981 claim for discrimination in hiring.
 
 
 29
 6. Whether the district court erred in denying complete individual relief to Willie Samuels, Wade Allen and Douglas Spencer, and in granting individual relief to Hugh Brooks and Sam Freeman.
 
 
 30
 7. Whether the district court erred in determining the amount of attorney's fees to be awarded to plaintiffs.
 
 
 31
 The issues will be examined in order and additional facts will be referred to as each issue is discussed.
 
 
 32
 Failure to Include Applicants Within Certified Class
 
 
 33
 Plaintiffs argue that the district court erred in refusing to redefine the class to include blacks who applied for employment with Motor Convoy but were not hired. The district court certified the class as present and former black employees of Motor Convoy within the Southern Conference of Teamsters International.[4]
 
 
 34
 In denying plaintiffs' request to include black applicants within the class, the district court found that Freeman and Spencer, both of whom were employees, had failed to show that their claims were typical of the claims of a class of applicants and that they could adequately protect the interests of a class of applicants as required by Rule 23(a) of the Federal Rules of Civil Procedure. The district court further determined that the interests of the named plaintiffs and a class of applicants would be antagonistic to the extent that the applicants might be entitled to retroactive seniority.[5] Finally, the court noted that plaintiffs' failure to include a hiring claim in their EEOC charges also militated against the inclusion of applicants within the class.
 
 
 35
 Plaintiffs assert that a sufficient nexus exists between their claims and the claims of a class of applicants because all the claims are based on racial discrimination. In support of their position, plaintiffs rely on the Fifth Circuit's decision in Falcon v. General Tel. Co. of the Southwest, 626 F.2d 369 (5th Cir.1980), vacated on other grounds, 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981), reinstated in part, 647 F.2d 633 (5th Cir.1981), rev'd, --- U.S. ----, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).
 
 
 36
 In Falcon, the plaintiff, a Mexican-American employee of the defendant company, brought a class action under Title VII challenging the hiring and promotion policies of the company. The plaintiff's individual claim was that the company had refused to grant him a promotion because of his national origin. Without conducting an evidentiary hearing, the district court concluded that the plaintiff could properly represent a class which included applicants and certified the class as all Mexican-Americans who had applied for employment or were employed by the company in its Irving, Texas division.
 
 
 37
 The Fifth Circuit affirmed the decision of the district court, concluding that because all of the claims were for discrimination based on national origin, a sufficient nexus existed between the plaintiff's claim of promotion discrimination and the other class members' claims of hiring discrimination. Id. at 375-76. Reaffirming its rule of permitting "across the board" attacks on discriminatory employment practices, the Fifth Circuit stated:
 
 
 38
 While similarities of sex, race or national origin claims are not dispositive in favor of finding that the prerequisites of Rule 23 have been met, they are an extremely important factor in the determination, that can outweigh the fact that the members of the plaintiff class may be complaining about somewhat different specific discriminatory practices.
 
 
 39
 Id. at 375. The court, therefore, concluded that the nexus between the plaintiff's claims and those of the class satisfied the requirements of Rule 23(a). Id. at 375-76.
 
 
 40
 The Supreme Court, however, recently reversed the judgment of the Fifth Circuit in Falcon and remanded the case for further proceedings. General Tel. Co. of Southwest v. Falcon, --- U.S. ----, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Court acknowledged that discrimination suits are often by their very nature class actions but stated that "the allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified." 102 S.Ct. at 2370-71. With respect to the particular facts presented in Falcon, the Court stated:
 
 
 41
 Without any specific presentation identifying the questions of law or fact that were common to the claims of respondent and of the members of the class he sought to represent, (footnote omitted) it was error for the district court to presume that respondent's claim was typical of other claims against petitioner by Mexican-American employees and applicants. If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential company-wide class action.
 
 
 42
 * * *
 
 
 43
 * * *
 
 
 44
 The district court's error in this case, and the error inherent in the across-the-board rule, is the failure to evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a).
 
 
 45
 Id. at 2371-72. The Court recognized the potential unfairness to class members of being bound by a judgment where the certified class is overbroad and concluded that "a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Id. at 2372-73.
 
 
 46
 In light of the Supreme Court's decision in Falcon, there is clearly no merit to plaintiffs' argument. The district court tentatively certified the class prior to the commencement of the trial and afforded plaintiffs an opportunity to present additional evidence during the trial in support of their motion to redefine the class to include black applicants. Following the trial, the district court carefully reviewed the prerequisites of Rule 23(a) and adhered to its original determination that plaintiffs had failed to satisfy the "typicality" and "adequate representation" requirements with respect to the representation of a class of applicants. The district court further noted the possibility of conflicting interests between the named plaintiffs and a class of applicants. Such a careful and thorough analysis of the requirements of Rule 23(a) is precisely what the Supreme Court mandated in Falcon.
 
 
 47
 It is well settled that questions concerning class certification are left to the sound discretion of the district court. E.g., Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d 1030, 1038-39 (5th Cir.1981); Walker v. Jim Dandy Co., 638 F.2d 1330, 1334 (5th Cir.1981); Boggs v. Alto Trailer Sales, Inc., 511 F.2d 114, 117 (5th Cir.1975). Assuming the district court's determination is made within the parameters of Rule 23, its decision on class certification will be upheld absent an abuse of discretion. Zeidman v. J. Ray McDermott & Co., Inc., supra at 1038-39. In the case at bar, plaintiffs essentially relied upon the now defunct "across-the-board" rule and failed to make a sufficient factual showing to satisfy the requirements of Rule 23(a). Accordingly, the court concludes that the district court did not abuse its discretion in denying plaintiffs' request to include applicants within the class.
 
 
 48
 Applicability of Section 703(h) to Seniority System's
 
 
 49
 Coverage of Atlanta Shop and Yard Employees
 
 
 50
 Section 703(h) of Title VII provides in pertinent part as follows:
 
 
 51
 Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin ....
 
 
 52
 42 U.S.C. Sec. 2000e-2(h). As previously discussed, the Supreme Court in Teamsters held that a seniority system may be bona fide, and therefore protected under Section 703(h), even though the system perpetuates the effects of prior discriminatory employment practices. International Brotherhood of Teamsters v. United States, supra 431 U.S. at 353-54, 97 S.Ct. at 1863-1864. Accordingly, under Teamsters a finding of a bona fide seniority system under Section 703(h) is precluded only where the system is created or maintained with an intent to discriminate. Id.; Terrell v. United States Pipe & Foundry Co., 644 F.2d 1112, 1116 (5th Cir.1981); Hodge v. McLean Trucking Co., 607 F.2d 1118, 1120 (5th Cir.1979); James v. Stockham Valves and Fittings Co., 559 F.2d 310, 353 (5th Cir.1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).
 
 
 53
 Prior to Teamsters, the Supreme Court had uniformly held that a prima facie case under Title VII could be established by merely showing that an employment policy or practice had a discriminatory impact. E.g., General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In Griggs v. Duke Power Co., supra, the Supreme Court held that: "[p]ractices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of the prior discriminatory employment practices." 401 U.S. at 430, 91 S.Ct. at 853. The Court in Teamsters, thus, construed Section 703(h) as an exception to its holding in Griggs that a neutral employment policy which perpetuates the effects of past discrimination is violative of Title VII.
 
 
 54
 Plaintiffs do not challenge the district court's finding that the seniority system at issue is bona fide within the meaning of Section 703(h). Rather, plaintiffs contend that the protection afforded bona fide seniority systems under Section 703(h) does not apply to seniority systems established after the 1964 enactment of Title VII. Based upon this interpretation of Section 703(h), plaintiffs argue that the seniority system's coverage of the Atlanta shop and yard employees is not protected by Section 703(h) because these employees were not covered by the seniority system until 1969.[6] Plaintiffs, therefore, argue that defendants are liable for the discriminatory effects of the seniority system on the Atlanta shop and yard employees under Griggs.
 
 
 55
 The abstract legal question that plaintiffs raise is whether the application of Section 703(h) is limited to pre-Act seniority systems. Plaintiffs rely primarily on Patterson v. American Tobacco Co., 634 F.2d 744 (4th Cir.1980), rev'd --- U.S. ----, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982), in which the Fourth Circuit concluded that "Congress intended the immunity accorded seniority systems by Sec. 703(h) to run only to those systems in existence at the time of Title VII's effective date, and of course to routine post-Act applications of such systems." Id. at 749.
 
 
 56
 The Supreme Court, however, recently reversed the Fourth Circuit's decision in Patterson and resolved this issue against plaintiffs. American Tobacco Co. v. Patterson, --- U.S. ----, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). The Supreme Court in Patterson noted that "Section 703(h) on its face immunizes all bona fide seniority systems, and does not distinguish between the perpetuation of pre- and post-Act discrimination." 102 S.Ct. at 1541 (quoting International Brotherhood of Teamsters v. United States, supra 431 U.S. at 348 n. 30, 97 S.Ct. at 1861 n. 30). After reviewing the legislative history, the Court held that Section 703(h) applies to all seniority systems regardless of whether the system was established before or after the enactment of Title VII. Id. In reaching this conclusion, the Court reasoned that "a construction of Sec. 703(h) limiting its application to seniority systems in place prior to the effective date of the statute would be contrary to its plain language, inconsistent with our prior cases, and would run counter to the national labor policy ...." Id. 102 S.Ct. at 1542.
 
 
 57
 In light of the Supreme Court's decision in Patterson, there clearly is no merit to plaintiffs' assertion that Section 703(h) is limited to pre-Act seniority systems. Accordingly, the court concludes that the district court did not err in applying Section 703(h) to the seniority system's coverage of the Atlanta shop and yard employees.
 
 
 58
 Applicability of Section 703(h) to Claims Under Section 1981
 
 
 59
 Plaintiffs next contend that the district court erred in holding that Section 703(h) of Title VII applies to plaintiffs' claims under Section 1981. Plaintiffs argue that Section 703(h) is limited to causes of action under Title VII and, therefore, has no applicability to claims under Section 1981.
 
 
 60
 The Fifth Circuit in Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157 (5th Cir.1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979), held that Section 703(h) affords absolute protection to bona fide seniority systems and, therefore, applies to Section 1981 claims as well as claims under Title VII. Id. at 1191 n. 37. This holding was reaffirmed by the Fifth Circuit in Terrell v. United States Pipe and Foundry Co., supra at 1118 (5th Cir.1981). See also Williams v. New Orleans Steamship Ass'n, 673 F.2d 742, 745 n. 18 (5th Cir.1982). The Fourth Circuit has also construed Section 703(h) as applying to both Title VII and Section 1981 claims. Johnson v. Ryder Truck Lines, Inc., 575 F.2d 471, 473-75 (4th Cir.1978). The Third Circuit, however, has adopted a contrary construction, concluding that Section 703(h) does not extend to claims under Section 1981. Bolden v. Pennsylvania State Police, 578 F.2d 912, 921 (3d Cir.1978).
 
 
 61
 Plaintiffs acknowledge that the district court was bound by the Fifth Circuit's holding in Pettway, but nevertheless assert that this court should reconsider the position adopted by the Fifth Circuit on this issue. In support of their argument, plaintiffs note that the Supreme Court in Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), recognized Title VII and Section 1981 as two separate and distinct causes of action for racial discrimination in employment. In Johnson, the Court held that because Title VII and Section 1981 are entirely separate causes of action, the timely filing of an EEOC charge of employment discrimination under Title VII does not toll the running of the statute of limitations period with regard to a claim under Section 1981. Id. at 466, 95 S.Ct. at 1723. Plaintiffs argue that this distinction between the two statutes renders Section 703(h) of Title VII inapplicable to claims under Section 1981.
 
 
 62
 Although the Johnson Court emphasized the distinction between causes of action under Title VII and Section 1981, it also acknowledged the close relationship between the two statutes. Id. at 459, 95 S.Ct. at 1719. The Court referred to Congress' pronouncement "that the remedies available to the individual under Title VII are co-extensive with the indiv[i]dual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. Sec. 1981, and that the two procedures augment each other and are not mutually exclusive." Id. (quoting H.R.Rep. No. 92-238, p. 19 (1971)), U.S.Code Cong. & Admin.News 1972, pp. 2137, 2154.
 
 
 63
 A construction of Section 703(h) which limits the application of the statute to Title VII actions would produce anomalous results. In certain cases, seniority systems could be lawful under Title VII but unlawful under Section 1981. As the Fourth Circuit noted in Johnson v. Ryder Truck Lines, Inc., supra, it is unlikely "that Congress intended to create conflicting and contradictory standards for determining what constitutes illegal discrimination." 575 F.2d at 475. Accordingly, we adhere to the position of the Fifth Circuit established in Pettway and, therefore, conclude that the district court correctly applied Section 703(h) to plaintiffs' claim under Section 1981.Proof of Discriminatory Intent Required Under Section 1981
 
 
 64
 Plaintiffs contend that liability under Section 1981 may be established merely by proof of a discriminatory impact. Plaintiffs, therefore, argue that the district court erred in holding that Section 1981 requires proof of intentional discrimination.
 
 
 65
 The Supreme Court, however, recently resolved this issue against plaintiffs in General Building Contractors v. Pennsylvania, --- U.S. ----, 102 S.Ct. 3141, 3143, 73 L.Ed.2d 835 (1982). In General Building Contractors, the Court held that "Sec. 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination." 102 S.Ct. at 3150. The district court in the case at bar, therefore, did not err in requiring proof of discriminatory intent under Section 1981.
 
 
 66
 Denial of Additional Equitable Relief for Discrimination in Hiring
 
 
 67
 The district court in its final judgment of December 31, 1980 concluded that the class members who had declined to transfer under the terms of the seniority system in effect prior to 1976, i.e. without carry-over seniority, were not discriminated against because the seniority system was lawful under Section 703(h). Plaintiffs argue that although this reasoning may apply to plaintiffs' transfer claims, it does not apply to plaintiffs' claim under Section 1981 for discrimination in refusing to hire blacks as drivers. Plaintiffs apparently argue that additional equitable relief is warranted in the form of the direct placement of hiring discriminatees in driving positions.
 
 
 68
 With regard to the timeliness of these hiring claims, plaintiffs contend that the appropriate limitations period for Section 1981 claims for equitable relief is 20 years pursuant to Ga.Code Ann. Sec. 3-704. Since the complaint was filed on February 9, 1972, plaintiffs assert that the class members who were hired after February 9, 1952 presented timely hiring claims under Section 1981 and are entitled to additional equitable relief.
 
 
 69
 There is no federal statute of limitations governing Section 1981. Accordingly, the limitations period is governed by the most appropriate state statute of limitations. Johnson v. Railway Express Agency, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295, 302 (1975). The Fifth Circuit in Whatley v. Department of Education, 673 F.2d 873 (5th Cir.1982), held that the most appropriate Georgia statute of limitations for claims under Section 1981 is Ga.Code Ann. Sec. 3-704 which provides in pertinent part as follows:
 
 
 70
 All suits for the enforcement of rights accruing to individuals under statutes, acts of incorporation, or by operation of law, shall be brought within twenty years after the right of action shall have accrued: Provided, however, that all suits for the recovery of wages, overtime or damages and penalties accruing under laws respecting the payment of wages and overtime, ... shall be brought within two years after the right of action shall have accrued.
 
 
 71
 Plaintiffs, therefore, are correct that the applicable limitations period for claims for equitable relief under Section 1981 is 20 years.
 
 
 72
 Although plaintiffs' hiring claims under Section 1981 were timely, it appears that plaintiffs have failed to show that additional equitable relief is necessary. The appropriate individual equitable relief for discrimination in refusing to hire blacks as drivers would be the direct placement of the hiring discriminatees in driving positions. However, all of the class members were given an opportunity to transfer to a driving position with full carry-over seniority pursuant to the district court's order of December 11, 1975. Moreover, the collective bargaining agreement was subsequently modified to provide for transfers to all positions with full carry-over seniority. It appears that all of the class members have transferred to the positions that they originally sought and for which they were qualified. Plaintiffs have simply failed to show that any class member is entitled to additional equitable relief for discrimination in hiring.
 
 
 73
 Plaintiffs had several opportunities to request additional equitable relief but did not do so until after the district court entered its final judgment on December 31, 1980. On June 30, 1981, plaintiffs filed a motion for reconsideration, contending that further equitable relief was warranted based upon plaintiffs' discrimination in hiring claims under Section 1981. The district court denied plaintiffs' motion, stating that plaintiffs had failed to show that additional equitable relief was necessary.[7] Accordingly, since it appears that plaintiffs have received all of the equitable relief they would be entitled to based upon their Section 1981 hiring claims, the court concludes that the district court did not err in ruling that additional equitable relief was unnecessary.
 
 Entitlement to Individual Relief
 
 74
 The district court affirmed the Special Master's findings concerning the individual claims for relief. Plaintiffs contend that the district court erred in finding that class members Willie Samuels, Wade Allen and Douglas Spencer were not entitled to complete individual relief. Defendants argue that the district court erred in awarding individual relief to Hugh Brooks and Sam Freeman.
 
 A. Willie Samuels
 
 75
 Willie Samuels was hired by Motor Convoy in 1962 as a yard employee at the Company's Birmingham terminal. Samuels' requests for a transfer to a driving position in 1963 and 1965 were denied. Samuels and another black employee subsequently filed an EEOC charge of discrimination against Motor Convoy. Samuels testified that the EEOC charge alleged that white employees with less seniority were receiving more work assignments and that the Company maintained segregated bathroom facilities.[8] According to Samuels, he simply wanted an equal opportunity to bid on job assignments.
 
 
 76
 On November 11, 1968, Samuels executed an EEOC conciliation agreement with Motor Convoy. Under the terms of the conciliation agreement, Motor Convoy agreed to desegregate all Company facilities and to assign all jobs in a fair and equitable manner. In return, Samuels agreed to waive his right to sue the Company "with respect to any matters which were or might have been alleged as charges filed with the Commission ...."
 
 
 77
 Samuels was not represented by an attorney when he signed the conciliation agreement but testified that he received advice from an EEOC representative. Samuels further stated that he read the agreement and then signed it upon the recommendation of the EEOC representative. The district court concluded that the conciliation agreement was valid and barred any claims by Samuels for acts occurring before November 11, 1968.
 
 
 78
 Samuels obtained a transfer to a driving position on February 1, 1973. The district court found that because of the Company's rejection of Samuels' transfer requests in 1963 and 1965, Samuels was deterred from seeking a transfer from 1965 until he obtained a transfer on February 1, 1973. The district court further found that after the execution of the conciliation agreement on November 11, 1968, the first driving vacancy occurred on May 2, 1972. Accordingly, the district court held that Samuels was entitled to backpay for the period from May 2, 1972 to February 1, 1973.
 
 
 79
 Plaintiffs argue that the conciliation agreement did not constitute a knowing and voluntary waiver of Samuels' rights. In support of this contention, plaintiffs assert that the conciliation agreement afforded Samuels virtually no substantive relief. Plaintiffs also note that Samuels did not consult with a lawyer before signing the conciliation agreement.
 
 
 80
 A waiver of remedial rights must be closely scrutinized. Watkins v. Scott Paper Co., 530 F.2d 1159, 1172-73 (5th Cir.1976). In evaluating the validity of such a waiver, the court must determine whether the employee's consent to the settlement agreement was knowing and voluntary. Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 & n. 15, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147, 160 (1974); Fulgence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209 (5th Cir.1981); United States v. Trucking Employers Inc., 561 F.2d 313, 318 (D.C.Cir.1977). The court should beware of any evidence of fraud or coercion. Fulgence v. J. Ray McDermott & Co., supra at 1209. Contrarily, if an employee voluntarily releases his employer from liability with a full understanding of the terms of the settlement agreement, he is bound by the terms of the agreement. Lyles v. Commercial Lovelace Motor Freight, Inc., 684 F.2d 501, 504 (7th Cir.1982); Fulgence v. J. Ray McDermott & Co., supra at 1209; Watkins v. Scott Paper Co., supra at 1172 n. 19.
 
 
 81
 There is no evidence that Samuels was coerced into signing the conciliation agreement. Although Samuels was not represented by an attorney when he executed the conciliation agreement, he did receive advice from an EEOC representative. Samuels testified that he read the agreement and consulted with the EEOC representative prior to signing the agreement. Under the terms of the agreement, Samuels obtained the relief that he sought, i.e., desegregation of all Company facilities and assignment of jobs in a fair and equitable manner. Consequently, it appears that Samuels knowingly and voluntarily executed the conciliation agreement. Accordingly, the district court did not err in holding that Samuels was bound by the conciliation agreement.
 
 
 82
 Plaintiffs further argue that the conciliation agreement is limited to claims under Title VII and, therefore, does not affect plaintiffs' rights under Section 1981. The release contained in the conciliation agreement provides as follows:
 
 
 83
 The charging party hereby agrees and covenants not to sue any Respondent with respect to any matters which were or might have been alleged as charges filed with the Commission, subject to performance by the Respondent of the promises and representations contained herein.
 
 
 84
 In light of the close relationship between Title VII and Section 1981, it is unlikely that the parties intended to limit the release to causes of action under Title VII. Rather, it appears that the agreement releases Motor Convoy from liability for employment discrimination with respect to the allegations contained in the EEOC charge regardless of the particular statutory cause of action asserted. Otherwise, the waiver would be meaningless, since Samuels could bring an action under Section 1981 based upon the same allegations contained in his Title VII EEOC charge. Consequently, the court concludes that the release contained in the conciliation agreement applies to Samuels' claims under both Title VII and Section 1981.
 
 B. Wade Allen
 
 85
 Wade Allen was hired by Motor Convoy in 1955 as a helper in the shop department. He did not request a transfer to a driving position prior to 1976 because he did not want to lose his seniority rights. Pursuant to the district court's order of December 11, 1975, Allen was notified that he would have 45 days in which to request a transfer. Allen interpreted the time period specified in the notice as 45 working days rather than 45 calendar days and, therefore, was late in filing his transfer request.
 
 
 86
 The Company, nevertheless, processed Allen's transfer request. A physical examination conducted by the Company physician revealed that Allen had high blood pressure. Allen's personal physician had diagnosed high blood pressure upon examining Allen in July 1975. Pursuant to company policy, employees with high blood pressure were not allowed to work as drivers. Consequently, Allen's transfer request was denied because he was not physically qualified to assume a driving position. The district court held that the Company did not discriminate against Allen in denying his transfer request because his transfer request was untimely and he failed to meet the physical requirements for a driving position.
 
 
 87
 Plaintiffs argue that because Motor Convoy was not prejudiced by the late filing of Allen's request, the district court erred in holding that the request was untimely. However, it was within the discretion of the district court to require the class members to submit their transfer requests to the Company by a certain date in order to be eligible for the relief provided by the court order. Penson v. Terminal Transport Co., 634 F.2d 989, 996 (5th Cir.1981). The time period specified in the notice is susceptible of only one reasonable meaning, i.e., 45 calendar days. The district court, therefore, did not abuse its discretion in holding that Allen's transfer request was untimely.
 
 
 88
 In any event, Allen's high blood pressure disqualified him from working as a driver. Consequently, even if Allen's transfer request had been timely filed, the denial of the request would not have been discriminatory since Allen did not meet the physical qualifications for a driving position. Accordingly, the district court did not err in denying Allen's claim for relief.
 
 C. Douglas Spencer
 
 89
 Douglas Spencer was employed by Motor Convoy from May 13, 1968 until May 1977 when he was discharged. He obtained a driving position on February 2, 1972. Spencer alleged that the Company retaliated and discriminated against him after the district court entered its order of December 11, 1975.
 
 
 90
 After being laid off from his driving position at the Atlanta terminal in October 1975, Spencer was given an opportunity to transfer to the Tampa terminal as a driver. Spencer accepted the transfer and reported to the Tampa terminal on October 23, 1975, but notified the Atlanta terminal manager that he wanted to retain his right to return to Atlanta. On October 21, 1975, the Company recalled certain employees at the Atlanta terminal who had been laid off, including Spencer. The company's policy was to notify employees who had been laid off of a recall by telephone or telegram. However, Spencer was never notified of the recall.
 
 
 91
 The Tampa manager informed Spencer that because more drivers were being hired at the Tampa terminal, Spencer would have to relinquish his right to return to the Atlanta terminal with full seniority in order to retain his number three position at the Tampa terminal. Spencer testified that the Tampa manager told him that no recall notice had been issued at the Atlanta terminal. On November 10, 1975, Spencer signed a written statement notifying the Atlanta terminal that he intended to stay in Tampa permanently. Spencer testified that he was still unaware of the recall notice when he signed the statement and that he would have returned to the Atlanta terminal if he had received notice of the recall.
 
 
 92
 Plaintiffs contend that Spencer did not knowingly and voluntarily waive his right to return to Atlanta. However, there is no evidence of fraud or coercion in connection with Spencer's decision to permanently remain in Tampa. As a result of notifying the Company of his intention to permanently remain in Tampa, Spencer retained his number three position out of 17 drivers at the Tampa terminal. Spencer had only been ranked number 121 out of approximately 144 drivers at the Atlanta terminal and, therefore, held a much more favorable position in Tampa. Spencer certainly understood the effect of the waiver and voluntarily signed the statement. Consequently, it appears that Spencer's waiver of his right to return to Atlanta with full seniority was valid.
 
 
 93
 Nevertheless, pursuant to the provision of the December 11, 1975 court order requiring class members to express their interest in a transfer within 45 days, Spencer submitted the following statement: "I, Douglas Spencer, wish to exercise my rights under the Federal Ruling." Because Spencer already held a driving position, it appears that he was simply seeking a transfer back to the Atlanta terminal. However, the order of December 11, 1975 only provided for transfers between departments within a terminal and not for transfers between terminals. Consequently, it appears that Spencer's request did not come within the scope of the December 11, 1975 order. In any event, there is no evidence of any discriminatory or retaliatory conduct on the part of the Company in denying Spencer's request. Accordingly, the district court did not err in denying Spencer's claim for relief based upon alleged discriminatory and retaliatory conduct of the Company.
 
 D. Hugh Brooks
 
 94
 Hugh Brooks was employed as a porter in the shop department at the Atlanta terminal. In accordance with the court's order of December 11, 1975, Brooks submitted a written request for a transfer to the "drive out chute" in the yard department. Leon Ford, the Atlanta terminal manager, denied the request because Brooks had not designated the terminal location. Hapeville is the location of the Atlanta terminal. Ford also testified that he told Brooks that the "drive out chute" was not a job classification. Brooks submitted a second transfer request which stated "drive out chute, Hapeville." Ford also denied this request.
 
 
 95
 Brooks eventually obtained a transfer to a yard position on November 2, 1976 but was not permitted to carry over his seniority. However, Brooks' seniority was restored in full in September 1978.
 
 
 96
 The district court found that Brooks had submitted a transfer request in accordance with the December 11, 1975 court order and that the Company had discriminated against Brooks in denying the request. The district court, therefore, awarded Brooks backpay from January 26, 1976, when his transfer request was denied, until September 1978, when his seniority was restored.
 
 
 97
 Defendants argue that the district court erred in granting individual relief to Brooks because the district court in its order of December 11, 1975 only found discrimination with respect to the restriction of transfers to driving positions. Furthermore, defendants assert that because the December 11, 1975 order was vacated, no relief should have been granted under its terms.
 
 
 98
 It is clear that the district court in its December 11, 1975 order found discrimination with respect to the restriction of transfers between all departments, including the shop and yard departments. In awarding Brooks backpay, the district court did not rely upon the findings contained in the December 11, 1975 order but rather based its award upon the finding that the Company intentionally discriminated against Brooks in refusing to grant his transfer request which had been filed in accordance with the December 11, 1975 order.[9] The district court found that Ford was aware of Brooks' transfer request but nevertheless rejected it and convinced Brooks that further requests would be futile. In addition, the district court found that Brooks was qualified for a yard position since he ultimately obtained a transfer to the yard department on November 2, 1976. Consequently, the evidence is sufficient to support a finding that the Company intentionally discriminated against Brooks in denying his transfer request. Accordingly, the district court did not err in awarding individual relief to Brooks.
 
 E. Sam Freeman
 
 99
 Sam Freeman was hired in 1957 as a porter in the shop department. In 1972, Freeman filed a grievance seeking classification as a helper. The Company and Local 528 agreed that Freeman's inability to read or write disqualified him from performing all of the duties under the helper job classification. Nevertheless, Freeman was classified and paid as a helper pursuant to a settlement agreement. The settlement agreement provided that Freeman would perform the duties he was qualified to perform and that when only one person was needed to perform the full-time duties of helper, Freeman could be laid off first regardless of his seniority.[10]
 
 
 100
 Freeman was laid off for a long period from 1974 to 1976. During that time there were 10 helpers on the shop roster. The district court found that the Company discriminated against Freeman by laying him off during this period in contravention of the 1973 settlement agreement. The district court concluded that if most of the ten helpers were working during that period, there would have been more than one person performing the full-time duties of helper on each shift. The district court, therefore, awarded Freeman backpay for the period between 1974 and 1976 when he was laid off.
 
 
 101
 Defendants argue that although a violation of the settlement agreement may have occurred, there is no evidence of racial discrimination in violation of Title VII. The district court, however, had previously found that Motor Convoy had conducted a pattern or practice of racial discrimination against black employees in hiring, assigning jobs and providing on-the-job training. Consequently, during the remedial phase of the case an inference existed that any particular employment decision was made pursuant to the Company's discriminatory employment policies.[11] International Brotherhood of Teamsters v. United States, supra 431 U.S. at 361-62, 97 S.Ct. at 1867-1868. The court concludes that sufficient evidence was presented to support a finding that Freeman was a victim of the Company's discriminatory employment practices. Accordingly, the district court did not err in awarding individual relief to Freeman.
 
 Attorney's Fees
 
 102
 The district court awarded attorney's fees to plaintiffs in the amount of $59,452.90. In calculating the award, the court used a bonus multiplier of 1.3, as requested by plaintiffs. The full amount of attorney's fees was assessed against Motor Convoy.
 
 
 103
 The district court's award of attorney's fees must be upheld unless a clear abuse of discretion is shown. Copper Liquors, Inc. v. Adolph Coors Co., 624 F.2d 575, 581 (5th Cir.1980); Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717 (5th Cir.1974). In determining a reasonable award of attorney's fees, the district court must consider the 12 factors set forth in Johnson v. Georgia Highway Express, Inc., supra, and articulate the basis for the award. Matter of First Colonial Corp. of America, 544 F.2d 1291 (5th Cir.), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).
 
 
 104
 Defendants first contend that the award of attorney's fees should be reduced because plaintiffs did not prevail on all issues. The Fifth Circuit in Jones v. Diamond, 636 F.2d 1364 (5th Cir.1981) (en banc ), set forth the standard for determining a proper award of attorney's fees where the plaintiffs have been only partially successful:
 
 
 105
 Time spent pursuing unsuccessful claims that were clearly without merit should be excluded. However, the mere fact that the litigants did not succeed in obtaining a judgment on all of the claims asserted does not mean that time spent pursuing these claims should automatically be disallowed.... Instead the court must consider the relationship of the claims that resulted in judgment with the claims that were rejected and the contribution, if any, made to success by the investigation and prosecution of the entire case.
 
 
 106
 Id. at 1382 (citations omitted); see also Clanton v. Orleans Parish School Bd., 649 F.2d 1084, 1102 (5th Cir.1981). In the case at bar, the district court found that plaintiffs had "conducted this litigation in good faith, and pursued neither frivolous claims nor unfounded motions." Defendants have presented no evidence to refute this finding. Accordingly, the court concludes that the district court did not abuse its discretion in refusing to reduce the award of attorney's fees because plaintiffs had not prevailed on all issues. The court further finds that the district court properly considered the factors set forth in Johnson v. Georgia Highway Express, Inc., supra.
 
 
 107
 Defendants next argue that the district court erred in applying a bonus multiplier. The Fifth Circuit has held that a bonus multiplier may be applied to increase an award of attorney's fees in civil rights actions since recovery of attorney's fees in such actions is contingent on success. Schneider v. City of Atlanta, 628 F.2d 915, 920 (5th Cir.1980); Harris v. City of Ft. Myers, 624 F.2d 1321, 1325 (5th Cir.1980); Knighton v. Watkins, 616 F.2d 795, 800-01 (5th Cir.1980). In Jones v. Diamond, supra, the Fifth Circuit stated that:
 
 
 108
 Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result. This is neither less nor more appropriate in civil rights litigation than in personal injury cases. The standard of compensation must enable counsel to accept apparently just causes without awaiting sure winners.
 
 
 109
 Jones v. Diamond, supra at 1382. Accordingly, the district court did not err in applying a bonus multiplier.
 
 
 110
 Finally, Motor Convoy asserts that the district court erred in failing to reduce the award of attorney's fees for the time spent litigating issues which only involved the defendant unions. The district court however found that:
 
 
 111
 ... because plaintiffs did not prevail against the defendant unions, they have attempted to identify and eliminate, wherever possible, time devoted exclusively to the issues of union liability. This is, of necessity, a small amount as all the issues were originally litigated as a single action, and counsel cannot be expected, in retrospect, to divide accurately the time spent among the various issues raised.
 
 
 112
 Consequently, the district court found that plaintiffs had already excluded, to the extent possible, the time spent on issues which only involved the defendant unions.
 
 
 113
 Alternatively, Motor Convoy argues that a portion of the award of attorney's fees should be assessed against the defendant unions. In support of this contention, Motor Convoy relies upon Allen v. Terminal Transport Co., Inc., 486 F.Supp. 1195 (N.D.Ga.1980), aff'd, 638 F.2d 1232 (5th Cir.1981). In Allen, the plaintiffs brought a class action against the defendant employer and the unions. Like the December 11, 1975 order in the case at bar, the court's original order in Allen finding the unions liable for the discriminatory effects of the seniority system was vacated by the Fifth Circuit following the Teamsters decision. Although the unions were absolved of liability, the court in Allen assessed one-third of the attorney's fees awarded to plaintiffs against the unions. Id. at 1202. The court stated that "fees are not being taxed against the unions because the seniority system perpetuated discrimination, albeit innocently; rather they participated substantially in opposing the legitimate demands of the plaintiff class, so the unions should share the costs to the class." Id. at 1202-03. In reaching this conclusion, the district court in Allen also noted that "[the employer] was often cooperative, and had the unions not been so steadfast in their opposition this controversy might have ended sooner." Id. at 1202.
 
 
 114
 The district court is in the best position to determine the extent of the unions' involvement in the action and whether an assessment of attorney's fees against the unions is warranted. In the case at bar, the defendant unions were absolved from all liability under Teamsters. Although the unions in Allen were also exonerated from liability, it appears that the participation of the unions in the case at bar was not as extensive as the involvement of the unions in Allen. In light of all of the circumstances, the court concludes that the district court did not abuse its discretion in assessing the full amount of attorney's fees against Motor Convoy.
 
 
 115
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, sitting by designation
 
 
 [1]
 In addition to transporting automobiles, the drivers are responsible for loading the automobiles, checking for damages, maintaining expense records and following government regulations. The duties of the yard employees include checking and signing for automobiles from the manufacturer, driving the automobiles from the manufacturer to the Company's facility and assisting the drivers in inspecting the automobiles before shipment. Shop employees are responsible for welding, mechanical work on engines, greasing automobiles, changing tires, steam cleaning automobiles and general custodial work
 
 
 [2]
 The class was subsequently redefined to include the following subclasses:
 (Class One) All black employees of Motor Convoy, Inc., excluding office and supervisory personnel, who are employed or who were employed and have been discharged or laid off since July 2, 1965, within the Southern Conference of Teamsters.
 (Class Two) All incumbent black employees employed as Garage ("Shop") or Yard employees at defendant Motor Convoy's Atlanta (Hapeville) facility.
 (Class Three) All incumbent black employees within the Southern Conference of Teamsters employed as over-the-road drivers who have previously transferred from job classifications in the Garage ("Shop") or Yard and who were not allowed to carry over their company seniority for bidding and other purposes.
 (Class Four) All incumbent black employees, excluding office and supervisory personnel, within the Southern Conference of Teamsters who were employed on or after February 12, 1968.
 (Class Five) All former black employees, excluding office and supervisory personnel, who were employed within the Southern Conference of Teamsters and have been discharged or laid off since August 16, 1969.
 
 
 [3]
 Based upon the parties' stipulations and the statistical evidence presented, the district court found that from 1965 through 1974 Motor Convoy hired 142 whites and five blacks as drivers at the Atlanta facility. All of the blacks who were hired as drivers during that period were hired after 1971 and two of the black drivers hired at that time were laid off within a month of their hiring date. Similar statistical evidence was presented with respect to the racial composition of the Company's Atlanta shop and yard departments
 
 
 [4]
 See note 2 supra
 
 
 [5]
 In an order dated February 11, 1976, the district court denied plaintiffs' motion to redefine the class to include black applicants. The court explained the potential conflict of interest between plaintiffs and a class of applicants as follows:
 Paragraph 7 of the December 10, 1975 decree, adopted substantially from paragraph 7 of the plaintiffs' proposed decree, provides in relevant part as follows:
 [W]henever a member of any of the Affected Classes seeks transfer or promotion, or seeks to protect his job in a layoff, rollback or re-assignment situation, the Affected Class member's company seniority shall be his applicable seniority for all purposes. The applicable seniority of other Affected Class members competing with class members for jobs shall be similarly determined, for purposes of that competition only. (emphasis added).
 Under these provisions, a job applicant who applied for a position in August, 1965, if given retroactive seniority, would be entitled to preferential transfer when competing with a class member actually hired after that date. In fact, if such an applicant were qualified, as discussed more fully below, he would be entitled to be called to active road driver status in preference to plaintiff Spencer, who testified that he became a "permanent" employee in 1966 and who was on layoff status as of the time of trial. (Mr. Spencer also testified that his road driver seniority date was February 2, 1972). Thus, plaintiff Spencer's interest would clearly be antagonistic to the interest of the fictional 1965 job applicant. Plaintiffs do not contend otherwise.
 
 
 [6]
 The Atlanta drivers have been covered by the collective bargaining agreements negotiated by the defendant unions since approximately 1946. However, the Atlanta shop and yard employees were not unionized and covered by the labor agreements until October of 1969, several years after the 1964 enactment of Title VII. The employees at the Birmingham terminal were all unionized and covered by the collective bargaining agreements prior to the enactment of Title VII
 
 
 [7]
 In denying plaintiffs' motion for additional equitable relief, the district court stated as follows:
 In our order of June 29, 1979, the court also stated:
 The 1976 order also included lengthy procedures for remedying the existing discrimination at Motor Convoy. These included provisions on transfer, hiring and recruitment, training, posting and compliance, and reporting. See 409 F.Supp. 1118-23. The parties should confer as to how much of the relief ordered in 1976 is still necessary. If necessary, we will allow additional fact finding.
 Order of June 29, 1979 at 10. We referred the issue to the Special Master for further proceedings. Plaintiffs did not request additional injunctive relief at that time, and the Special Master made no findings on the issue. In our order of December 31, 1980 reviewing the Special Master's Report, we noted that due to changes instituted in conformance with our original decree, "general injunctive relief is not required," and we noted plaintiffs' omission in addressing the issue and permitted plaintiffs twenty days to respond. See Order of December 31, 1980 at 7. Plaintiffs now argue that certain provisions of this court's decree relating to discrimination by the defendant Company in hiring and training should be extended.
 As noted above, in our June 29 order the court stated that "if the relief ordered in 1976 is still necessary," "we will allow additional fact finding." Plaintiffs did not develop facts before the Special Master showing that additional equitable relief was necessary, and plaintiffs state no facts in their motion for reconsideration on which this court could reach that conclusion.
 Plaintiffs do not assert that the procedures for remedying the discrimination at the defendant Company have been inadequate or unsuccessful. Injunctive relief is only afforded on a showing of necessity, and the equitable jurisdiction of this court cannot be extended in the absence of such a showing. We will deny plaintiffs' motion for reconsideration.
 
 
 [8]
 A copy of Willie Samuels' EEOC charge was not available. In a deposition taken on June 3, 1980, Samuels testified as to the allegations contained in the EEOC charge
 
 
 [9]
 Defendants contend that the situation in the case at bar is analogous to a person being held in contempt for violation of a judgment that was subsequently found to have been entered erroneously or without jurisdiction. The Supreme Court has held that a contempt order must be vacated when it is based upon a violation of a judgment which was entered erroneously. Donovan v. Dallas, 377 U.S. 408, 411-12, 84 S.Ct. 1579, 1582, 12 L.Ed.2d 409, 413 (1964)
 The situation in the case at bar, however, is clearly distinguishable. The district court's award of relief is not based upon the Company's failure to comply with the December 11, 1975 court order but rather upon the evidence establishing that the Company intentionally denied Brooks' transfer request because of his race.
 
 
 [10]
 The settlement agreement entered into by Freeman and the Company provided as follows:
 [I]t was agreed that due to Mr. Freeman's limited education he was not qualified to perform the duties under the helper classification.
 It was agreed that he will be classified as a helper and be paid the helper classification rate. It was also agreed that Mr. Freeman is to continue in the same job as porter and to assist and perform duties in the helper classification where he is qualified, but where only one man is used for full time duties in the helper classification, if Mr. Freeman is not qualified to perform said duties due to his limited education he then could possibly be passed over on classification seniority at no liability to the company.
 
 
 [11]
 In International Brotherhood of Teamsters v. United States, supra, the Supreme Court held that:
 [A]s is typical of Title VII pattern-or-practice suits, the question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decision making.
 The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy.
 Id. 431 U.S. at 361-62, 97 S.Ct. at 1867-1868.