[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 11 2000
THOMAS K. KAHN
CLERK

_____

No. 99-10782

_____

D. C. Docket No. 97-807-CV-ASG

DAVID RUTSTEIN,

Plaintiff,

ZEREI AGUDATH ISRAEL BOOKSTORE, LEVI SUFRIN,

Plaintiffs-Appellees,

versus

AVIS RENT-A-CAR SYSTEMS, INC., a Delaware
Corporation, authorized to do business in the
State of Florida,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 11, 2000)**

Before TJOFLAT, Circuit Judge, RONEY and FAY, Senior Circuit Judges.

TJOFLAT, Circuit Judge:

Jewish plaintiffs[1] brought this civil rights lawsuit in the United States District Court for the Southern District of Florida on behalf of themselves, and all others similarly situated, against Avis Rent-A-Car System, Inc. ("Avis"). Plaintiffs alleged that Avis had denied them their right to make and enforce contracts because of their race, ancestry, and ethnic characteristics,[2] in violation of 42 U.S.C. § 1981 (1994).[3] They sought compensatory damages, punitive damages, and injunctive relief. The district court certified the case as a class action under Federal Rule of Civil Procedure

---

[1] One of the named plaintiffs in this action is the Zerei Agudath Israel Bookstore. For ease of discussion, we refer to all plaintiffs as persons (and, therefore, as "he or she" instead of "it").

[2] We refer to plaintiffs' allegations as a complaint for discrimination on the basis of plaintiffs' ethnicity.

[3] As amended, 42 U.S.C. § 1981 provides:
(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

23(b)(3).[4]  Pursuant to Rule 23(f),[5] we permitted Avis to appeal the district court's

class certification decision.  We now reverse.

---

[4] Federal Rule of Civil Procedure 23(a) and (b) provides:
> (a) Prerequisites to a Class Action.  One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
> (b) Class Actions Maintainable.  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>>> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>>> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
>> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

[5] Federal Rule of Civil Procedure 23(f) provides:
> A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order.  An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

I.

The procedural history of this case is somewhat complicated by the fact that the original plaintiff, David Rutstein, was apparently not all that he claimed to be. On May 6, 1997, Rutstein filed a complaint alleging that Avis, a corporation engaged in the business of renting cars, had "adopted as an official corporate policy a practice to discriminate against Jewish customers as a class of people and [had] instructed its employees to decline to open a corporate account for a business owned and/or operated by this class of people."[6] Rutstein claimed that at Avis' World Reservations Center in Tulsa, Oklahoma (the "Reservation Center"), employees had been instructed not to open corporate accounts for "Yeshivas." A Yeshiva was understood to be someone with a "Jewish sounding name" or "Jewish accent."[7] When a telesales representative at the Reservations Center identified a caller requesting to open a corporate account as a Yeshiva, the caller was either denied the account entirely, or was issued a "bogus" account that was not accorded the same benefits as those associated with a legitimate corporate account.

---

[6] A corporate account is a vehicle rental account offered by Avis that provides account holders with discount car rentals, bonus plans, and other financial incentives.

[7] Webster's Third defines a "Yeshiva" as "a school for advanced Talmudic study." Webster's Third New International Dictionary 2651 (1993).

Rutstein claimed that he had applied for, but was denied, a corporate account because he is Jewish. Specifically, Rutstein alleged that

> [c]ommencing January 1993, [he] resided in North Miami Beach, Florida and operated Rutstein Insurance Agency. Upon application to Avis to open a corporate account and advising the account representative that [he] formerly lived in Crown Heights, New York and that the purpose of the opening of the account was to permit . . . Rutstein to visit his rabbi in New York and to conduct ongoing business in New York, the Plaintiff was advised that he would not qualify for the opening of a corporate account.

Three months later Rutstein moved the court to certify a class, under Federal Rule 23(b)(2) and Rule 23(b)(3), of "all Jewish individuals and Jewish-owned businesses who have attempted to contract, have contracted, or will in the future contract with Avis to open a corporate rental account and who were or will be subjected to the policies and practices known as the 'Yeshiva policy'." Immediately after Rutstein filed his class certification motion, however, events occurred which made it apparent that he might not be an adequate class representative. Rutstein failed to appear at a court-ordered deposition scheduled for October 28, 1997, prompting Avis to move the court to dismiss the action, hold Rutstein in contempt, and direct him to pay expenses,

5

including attorneys' fees, incurred by Avis as a result of his failure to appear.[8]

Further, Avis moved the court for summary judgment, contending that

> [e]vidence independently obtained by Avis demonstrates that plaintiff does not have a valid claim against Avis. Among other things, plaintiff never owned and operated a "Rutstein Insurance Agency" which he claims had existed since January 1993 and which he claims was wrongfully denied a corporate account by Avis. The evidence reveals that it was not until November 1993 that plaintiff even obtained an insurance license for himself as an individual and received his first appointment as an insurance agent by an insurer. No Rutstein Insurance Agency has ever been registered with the Florida Department of Insurance. Plaintiff's current business, known as Senior Allican, Inc., was not incorporated until August 1997, five months after this lawsuit was filed.

At a hearing before the district court on January 30, 1998, Rutstein's counsel admitted that Rustein was not an appropriate representative of the class. Counsel claimed that Rutstein had become "intimidated" by Avis's aggressive defense strategies, and that Rutstein had decided that he did not want to represent a class of "thousands" after all. Counsel assured the court that there was no cause for concern, however, and that the action could live on. On December 5, 1997, counsel had filed a motion on behalf of the Zerei Agudath Israel Bookstore ("ZAI"), located in Chicago, Illinois, to intervene in the case as a plaintiff and proposed class representative under

---

[8] Rutstein's counsel claimed that Rutstein failed to appear because he was "not feeling well." On December 3, 1997, the district court issued an order requiring Rutstein to pay all costs incurred by Avis as a result of his failure to appear at the deposition, and to schedule a time, within 10 days, at which he could be deposed.

Federal Rule of Civil Procedure 24(b).[9]  ZAI alleged that it was "a Jewish business which was subject to the precise discriminatory business practices which lie at the heart of [Rutstein's] complaint.  [ZAI] applied for and received Avis account status, but once Avis discovered that [ZAI] was what Avis considered a 'Yeshiva', it terminated [ZAI's] account . . . ."[10]  On February 23, 1998, ZAI sought class certification under Rules 23(b)(2) and (3), seeking to represent a class of

---

[9] Federal Rule of Civil Procedure 24(b) provides that "[u]pon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common."

[10] In an amended complaint filed on February 23, 1998, ZAI detailed the circumstances of the alleged discrimination:

> In early 1995, ZAI, through its employee Joshua Borenstein, applied to Avis for an account, so that the bookstore's employees might get discounts when they rented automobiles.  The bookstore uses rental cars frequently for trips to New York and other cities to pick up specially ordered books.  ZAI's application, made in its full name of Zeirei Agudath Israel, was turned down.  ZAI is an ongoing business and should have qualified to receive an Avis account, but upon information and belief, ZAI was denied the account because of its obviously Jewish sounding name.
>
> About a year later, ZAI applied again.  The store was at a new address, and this application was made in the name of Z.A.I. bookstore, which is the name it is commonly known by, rather than Zeirei Agudath Israel bookstore, the name it used the first time it applied to Avis for an account.  This time, the account was approved.  Upon information and belief, ZAI was approved the second time it applied to Avis for an account, because the account representatives at Avis did not recognize ZAI as a Jewish sounding name.
>
> Before ZAI started renting vehicles from Avis, however, Mr. Borenstein requested an application for credit.  He was sent the application, filled it out, sent it back and waited.
>
> Eventually ZAI received a perplexing letter from Avis, informing it that because of excessive use by drivers under the age of 25, the account was rescinded.  No one had ever used the Avis account.  Upon information and belief, Avis rescinded ZAI's account because through the credit application process, Avis discovered that the Z.A.I. bookstore stood for Zeirei Agudath Israel bookstore, which it concluded was a "Yeshiva".

7

[a]ll Jewish individuals and Jewish-owned businesses who, subsequent to January 1, 1990, have attempted to contract, have contracted, or will in the future contract with Avis to open an account for use in their business, and who were refused an account, had their account canceled, or were given a less advantageous account because of their religion, ancestry, and/or ethnicity.

On March 27, 1998, the district court granted ZAI's Rule 24(b) motion to intervene, reasoning that because Rutstein was plainly inadequate as a class representative, intervention by ZAI would "strengthen the adequacy of class representation." The court also denied Avis' motion for summary judgment against Rutstein, denied Rutstein's request to act as class representative, and concluded that Rutstein could remain in the case as a nonrepresentative class member. A month later, the court also granted Levi Suffrin's motion to intervene as a plaintiff and proposed class representative under Rule 24(b). Suffrin had filed a complaint on February 23, 1998, alleging that his corporate account had been terminated by Avis, and that the explanation Avis proffered for the termination (that he had presented a false identification when trying to rent a vehicle) was pretextual.[11]

Finally, on February 8, 1999, the district court granted ZAI and Suffrin's motion for class certification under Federal Rule 23(b)(3). The court also denied class

---

[11] The district court initially consolidated Suffrin's case with Rutstein's before granting Suffrin's motion to intervene under Rule 24(b).

8

certification under Rule 23(b)(2). Avis sought an interlocutory appeal of the class

certification decision under Rule 23(f) and we granted permission to appeal.

## II.

The initial burden of proof to establish the propriety of class certification rests

with the advocate of the class. Jones v. Diamond, 519 F.2d 1090, 1099 (5th Cir.

1975).[12] Assuming that the district court correctly interpreted the applicable law, we

review the court's grant of class certification for an abuse of discretion. Andrews v.

American Tel. & Tel. Co., 95 F.3d 1014, 1022 (11th Cir. 1996).

## III.

### A.

"A class action may be maintained only when it satisfies all the requirements

of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b)."

Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997) (footnote

omitted). In the instant case, the district court certified a class under Rule 23(b)(3),

which provides that

---

[12] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

> [a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition . . .
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). That common questions of law or fact predominate over individualized questions means that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." Kerr v. City of West Palm Beach, 875 F.2d 1546, 1558 (11th Cir. 1989) (quoting Nichols v. Mobile Bd. of Realtors, Inc., 675 F.2d 671, 676 (5th Cir. Unit B 1982)).[13] "The predominance inquiry focuses on 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and is 'far more demanding' than Rule 23(a)'s commonality requirement." Jackson, 130 F.3d at 1005 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24, 117 S. Ct. 2231, 2249-50, 138 L. Ed. 2d 689 (1997)).

In order to determine whether common questions predominate, "we are called upon to examine the cause[] of action asserted in the complaint on behalf of the

_____

[13] In Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

10

putative class." McCarthy v. Kleindienst, 741 F.2d 1406, 1412 (D.C. Cir. 1984). Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S. Ct. 2231, 2249 138 L. Ed. 2d 689 (1997) ("[The predominance] inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy."); Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S. Ct. 2454, 2458, 57 L. Ed. 2d 351 (1978) ("[C]lass determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' ") (quoting Mercantile Nat. Bank v. Langdeau, 371 U.S. 555, 558, 83 S. Ct. 520, 522, 9 L. Ed. 2d 523 (1963)); id. at 469 n.12, 98 S. Ct. at 2458 n.12 (" 'The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.' ") (quoting 15 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3911, p. 485 n.45 (1976)); Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996) ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."); Huff v. N.D. Cass Co., 485 F.2d 710, 714 (5th Cir. 1973) (en banc) ("It is inescapable that in some cases there will be overlap between the demands

11

of [Rule] 23(a) and (b) and the question of whether plaintiff can succeed on the merits.").

In Jackson, plaintiffs sought class certification for, inter alia, a class of African-American customers who alleged that Motel 6 discriminated against its customers on the basis of race by either denying African-Americans motel accommodations altogether, or providing them with substandard accommodations. The substantive law of the underlying cause of action in Jackson required each plaintiff to establish that "(1) a Motel 6 employee denied him a room (or rented him a substandard room) on the basis of his race and either (2) that that employee had the general authority to rent motel rooms or (3) that that employee was acting in accordance with a Motel 6 policy or practice of racial discrimination." Jackson, 130 F.3d at 1006 n.13 (emphasis omitted). Given this, we held that "the single common issue in the . . . case – whether Motel 6 has a practice or policy of discrimination – is not . . . predominant over all the other issues that will attend the Jackson plaintiffs' claims." Id. at 1006. We explained that

> [t]he Jackson plaintiffs' claims will require distinctly case-specific inquiries into the facts surrounding each alleged incident of discrimination. The issues that must be addressed include not only whether a particular plaintiff was denied a room or was rented a substandard room, but also whether there were any rooms vacant when that plaintiff inquired; whether the plaintiff had reservations; whether unclean rooms were rented to the plaintiff for reasons having nothing to do with the plaintiff's race; whether the plaintiff, at the time that he

12

requested a room, exhibited any non-racial characteristics legitimately counseling against renting him a room; and so on . . . . These issues are clearly predominant over the only issue arguably common to the class – whether Motel 6 has a practice or policy of racial discrimination. Indeed, we expect that most, if not all, of the plaintiffs' claims will stand or fall, not on the answer to the question whether Motel 6 has a practice or policy of racial discrimination, but on the resolution of these highly case-specific factual issues.

Id.

In light of our decision in Jackson, we cannot see how plaintiffs can maintain a class action under Rule 23(b)(3) in the instant case. In order to make out a prima facie case of non-employment discrimination sufficient to withstand a motion for judgement as a matter of law under section 1981, a plaintiff will have to establish that (1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (in this case, the making and enforcing of a contract).[14]  See Bellows v. Amoco Oil Co., 118 F.3d 268, 274 (5th Cir. 1997); Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996); Mian v. Donaldson,

_____

[14] This formulation differs, somewhat, from that articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).  Under McDonnell Douglas, an individual complaining of disparate treatment in employment can establish a presumption that the individual was discriminated against on the basis of his or her race by showing that (i) he or she belongs to a racial minority; (ii) he or she applied and was qualified for a job for which the employer was seeking applicants; (iii) the applicant was rejected despite his or her qualifications; and (iv) after the rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications, or the position was filled by a member of an unprotected class.

13

Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993). The critical element, obviously, is the second. Each plaintiff will have to bring forth evidence demonstrating that the defendant had an intent to treat him or her less favorably because of the plaintiff's Jewish ethnicity. See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 3150, 73 L. Ed. 2d 835 (1982) (holding that "§ 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination"); Freeman v. Motor Convoy, Inc., 700 F.2d 1339, 1350 (11th Cir. 1983); Lee v. Washington County Bd. of Educ., 625 F.2d 1235, 1237 (5th Cir. 1980) ("A showing of discriminatory purpose is required to prove a prima facie case of discrimination under 42 U.S.C. [§] 1981."). As in Jackson, plaintiffs in the instant case argue that the issue of whether Avis maintains a policy or practice of discrimination predominates over all the legal and factual questions affecting only individual members of the class. Given that each plaintiff must demonstrate that he or she suffered from intentional discrimination, however, "we expect that most, if not all, of the plaintiffs' claims will stand or fall, not on the answer to the question whether [Avis] has a practice or policy of [ethnic] discrimination, but on the resolution of . . . highly case-specific factual issues." Jackson, 130 F.3d at 1006.

Whether Avis maintains a policy or practice of discrimination may be relevant in a given case, but it certainly cannot establish that the company intentionally

14

discriminated against every member of the putative class. The individual issues that must be addressed include not only whether Avis actually denied a particular plaintiff a corporate account, gave the plaintiff a less advantageous account, or cancelled the plaintiff's account, but also whether the particular plaintiff was of the age required by Avis to qualify for a corporate account; whether the plaintiff met the financial criteria for a corporate account; whether the nature of the plaintiff's expected use of Avis vehicles would make the transaction cost-justified for Avis; whether the plaintiff would be renting cars from Avis in a criminally high-risk or low-risk geographical area; whether the Avis employee who allegedly denied the plaintiff a corporate account judged the caller-applicant to be lying about his or her qualifications based on information not related to the caller's ethnicity; and so on, and so on. All of these issues are clearly case-specific, and they will all have to be addressed in one way or another in order for each plaintiff to demonstrate a prima facie case of intentional discrimination.

"[S]erious drawbacks to the maintenance of a class action are presented where initial determinations, such as the issue of liability vel non, turn upon highly individualized facts." McCarthy, 741 F.2d at 1415; see Andrews, 95 F.3d at 1024 (in action against telephone companies' provision of 900-number services in which plaintiffs claimed, inter alia, that companies were violating gambling laws, court held

15

that "aspects of each 900-number program will have to be individually examined to determine whether a particular program actually involves gambling or runs afoul of state gaming laws"); Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420 (5th Cir. 1998) ("The success of [claims for intentional discrimination] will turn ultimately on the special circumstances of each individual's case."). The importance of these individualized issues, relative to the one common issue of whether Avis maintains a policy or practice of discrimination, is amplified by the fact that even if plaintiffs can demonstrate that a general policy or practice of discrimination was applied in their cases, Avis can escape liability by showing that an individual plaintiff would have been denied or terminated even if no such policy or practice had existed.[15] See Mabra v. United Food & Commercial Workers Local Union No. 1996, 176 F.3d 1357 (11th Cir. 1999) (holding that the mixed-motive amendments to Title VII enacted in the Civil Rights Act of 1991, see Pub. L. No. 102-166, 105 Stat. 1071, 1075 (1991) (codified as amended at 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B)), do not apply to claims brought under section 1981); Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 270-71 n.21, 97 S. Ct. 555, 566 n.21, 50 L. Ed. 2d

---

[15] The nature of plaintiffs' allegations makes this issue especially significant, since Avis will apparently be able to argue in defense that an individual plaintiff does not have a "Jewish sounding name" or a "Jewish accent." If Avis was unable to determine whether a caller-applicant was Jewish at the time that the caller applied for a corporate account, then it would have been impossible for Avis to have intentionally discriminated against the caller on the basis of his or her ethnicity.

16

450 (1977) (in race discrimination case brought under the Fourteenth Amendment, proof by the defendant "that the same decision would have resulted even had the impermissible purpose not been considered" would establish that "the complaining party . . . no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose"); cf. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285, 97 S. Ct. 568, 575, 50 L. Ed. 2d 471 (1977) (same, in case alleging violation of plaintiff's free speech rights under the First and Fourteenth Amendments).  For these reasons, we hold that the plaintiffs have failed to meet the predomination requirement of Rule 23(b)(3).

B.

Plaintiffs argue that the Supreme Court's decision in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977), compels a different result.  Teamsters was a pattern or practice employment discrimination case in which the government proved that "racial discrimination was the company's standard operating procedure – the regular rather than the unusual practice." Id. at 336, 97 S. Ct. at 1855.  Given this finding, the Court held that

> [t]he proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. [With regard to individual relief,] [t]he Government need only show that

17

an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination. As in [Franks v. Bowman Transportation Co., Inc., 424 U.S. 747, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1976)], the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.

Id. at 362, 97 S. Ct. at 1868 (footnote omitted).[16] It is clear that Teamsters applies in private class actions alleging systemic disparate treatment in employment. See Franks, 424 U.S. at 772, 96 S. Ct. at 1268 (holding in class action context that a demonstration by the plaintiff class of the existence of a discriminatory pattern or practice establishes a presumption that the individual class members had been discriminated against on account of race); Cooper v. Federal Reserve Bank, 467 U.S. 867, 875-76 & n.9, 104 S. Ct. 2794, 2799 & n.9, 81 L. Ed. 2d 718 (1984) (affirming Franks); Foster v. Board of School Comm'rs, 872 F.2d 1563, 1565 (11th Cir. 1989);

---

[16] The importance of a finding of class-wide discrimination in subsequent individual proceedings in the employment context is justified by the burden imposed on the plaintiff class to bring forth evidence of a policy or practice of discrimination sufficient to allow a court to conclude (absent an employer's rebuttal) that every member of the plaintiff class suffered illegal discrimination by the employer. Compare Teamsters, 431 U.S. at 342 n.23, 97 S. Ct. at 1858 n.23 (finding pattern or practice of discrimination where number of African-Americans and Spanish-surnamed persons hired for line-driver positions approached "the inexorable zero") (citation omitted); Paradise v. Prescott, 767 F.2d 1514, 1529 (11th Cir. 1985) (pattern or practice established where plaintiffs demonstrated that "in the 37 years preceding the institution of [the lawsuit] the [employer] did not have a single black on its . . . payroll") with Reynolds v. Roberts, 202 F.3d 1303, 1319 n.27 (11th Cir. 2000) (suggesting that it would be difficult to establish that the employer was engaged in a pattern or practice of racial discrimination since "it is undisputed that the [employer] hired thousands of blacks" and promoted many of them to positions equal or superior to those to which their white counterparts were assigned).

Freeman, 700 F.2d at 1356.[17]  Further, Teamsters applies in employment

discrimination cases brought under section 1981 to the same degree that it applies in

cases brought under Title VII.  As the former Fifth Circuit stated in Lee,

> the principles governing an individual's right to back pay and injunctive
> relief in cases of class-based employment discrimination brought under
> 42 U.S.C. §§ 1981 and 1983 are clear.  Once purposeful discrimination
> against a class is proved, a presumption of an entitlement to back pay
> and individual injunctive relief arises with respect to the members of that
> class.  The burden of proof then shifts to the employer to show . . . that
> the individual member of the class seeking relief would not have been
> hired absent the discrimination.

Lee, 625 F.2d at 1239.  Plaintiffs therefore argue that since the establishment of a

policy or practice of discrimination shifts the burden to the defendant to establish that

each member of the plaintiff class is not entitled to relief, the policy or practice issue

must necessarily predominate under Rule 23(b)(3).

The argument must fail for two reasons.  First, the Teamsters rationale is

particularly appropriate in employment discrimination cases because of the

---

[17] Some of our cases have been in conflict with regard to whether, subsequent to the establishment of a pattern or practice of discrimination, individual plaintiffs get a presumption in favor of individual relief, or whether the showing of class-wide discrimination creates an inference that any particular employment decision was made pursuant to the employer's discriminatory policies.  Compare Foster, 872 F.2d at 1565 ("Because plaintiffs had already proven that the school board had engaged in a pattern or practice of discrimination . . . [each] member presumptively was entitled to relief . . . .") with Freeman, 700 F.2d at 1356 ("[D]uring the remedial phase of [a pattern or practice case] an inference existed that any particular employment decision was made pursuant to the Company's discriminatory employment policies.").  We need not address the issue here, because we find that the Teamsters rationale does not apply in the instant case.

19

relationship between a finding of systemic disparate treatment by an employer, and a plaintiff's burden under McDonnell Douglas to establish a prima facie case of individual disparate treatment. After a pattern or practice of discrimination has been proven, Teamsters mandates that in order to gain individual relief plaintiffs must come forward and "show that [they] unsuccessfully applied for a job." Teamsters, 431 U.S. at 362, 97 S. Ct. at 1868.[18] On the other hand, without a finding of class-wide discrimination, under McDonnell Douglas individual plaintiffs would have to come forward and show that (i) they belong to a racial minority; (ii) they applied and were qualified for the job at issue; (iii) they were rejected; and (iv) after the rejection, the position remained open and the employer continued to seek applicants, or the position was filled by a member of an unprotected class. See McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. By comparing these two burdens imposed on individual plaintiffs (the burden on the plaintiff who can benefit from a previous finding of class-wide discrimination (as in Teamsters), and the burden imposed on the plaintiff who does not have the benefit of such a finding (as in McDonnell Douglas)), it becomes clear that the way in which a finding of systemic disparate treatment functions in an

---

[18] The primary relief afforded to the plaintiff class in a pattern or practice case is declaratory or injunctive. See Teamsters, 431 U.S. at 361, 97 S. Ct. at 1867 (holding that after a pattern or practice of discrimination has been established, "[w]ithout any further evidence . . . a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order . . . ."). Individual plaintiffs are required to come forward and show that they unsuccessfully applied for a job only if they want individual relief.

20

individual plaintiff's case is as a substitute for a prima facie finding that the plaintiff was qualified. The requirement that individual plaintiffs must come forward and "show that [they] unsuccessfully applied for a job," after it is already established that the employer was engaged in a pattern or practice of discrimination, means that individual plaintiffs are never relieved of their burden of establishing that (i) they belong to a racial minority (otherwise, they would not fit within the definition of the class); (ii) they applied for the job; (iii) they were rejected; and (iv) there was a position available for which the employer was seeking applications when the plaintiff applied.[19] The only McDonnell Douglas factor that individual plaintiffs are relieved from establishing in the first instance in a Teamsters case is that they were fully

---

[19] Requiring a plaintiff to demonstrate that he or she unsuccessfully applied for a job necessarily implies that the plaintiff must demonstrate that there was a job available for which the employer was seeking applications. This is somewhat different, however, from the fourth requirement imposed on a plaintiff in a McDonnell Douglas case to establish that after the plaintiff was rejected, the position remained open and the employer continued to seek applicants, or the position was filled by a member of an unprotected class. See McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. The fourth McDonnell Douglas requirement in part focuses on the same issue that individual plaintiffs are required to address in a Teamsters case – that is, whether or not there was ever a job available for which the employer was seeking applications. If there never was a job, it would be inappropriate to allow suits against the employer for wrongful rejection. Every member of every protected class would have a right to a job of his or her choice, regardless of whether or not there is a job to be had. But the fourth requirement in McDonnell Douglas asks the plaintiff to establish not only that there was a job available when the plaintiff applied, but also that the job was not filled by a member of a protected class (the job either has to have remained open, or it has to have been filled by a member of an unprotected class in order for the plaintiff to survive judgment as a matter of law). In a Teamsters case, plaintiffs have already brought forth evidence of a pattern or practice of discrimination sufficient to allow a court to conclude (absent an employer's rebuttal) that every member of the plaintiff class suffered illegal discrimination by the employer; therefore, if the individual plaintiff in a Teamsters case can establish that there was a job available when the plaintiff applied, then the court can assume that the position was not filled by a member of a protected class.

qualified for the job at issue.  Teamsters therefore stands for the proposition that where a plaintiff class can demonstrate a policy or practice of discrimination so pervasive that a court is justified in concluding that qualifications were entirely irrelevant to the employer (because the employer would not hire, for example, an African-American, or a woman, or a Roman Catholic, no matter how well qualified), then individual plaintiffs are relieved of the prima facie burden of demonstrating that they were qualified for the job at issue in subsequent individual proceedings.

To understand this point is to see why the Teamsters rationale cannot apply in the instant case.  In contrast to a McDonnell Douglas case, a plaintiff in this non-employment discrimination case will have to demonstrate that (1) he or she is a member of racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute.  The second requirement is more demanding than any of the requirements imposed on plaintiffs in a McDonnell Douglas case, requiring, as it does, that the plaintiff bring forth evidence of actual intent on the part of the defendant.  A finding that Avis has a policy or practice of discrimination could not possibly function as a meaningful substitute for the establishment of an actual intent to discriminate against an individual plaintiff on the basis of his or her ethnicity.  This is because the legitimate reasons why Avis might have judged an individual plaintiff to be

22

"unqualified" for a corporate account are far more various and individualized than in the employment context. The requirement that an individual demonstrate that he or she is "qualified" for a job under McDonnell Douglas is not particularly rigorous; the same does not hold true in the instant case where Avis may have refused to contract with a plaintiff for any number of reasons having nothing to do with the plaintiff's ethnicity.[20] Thus, even if plaintiffs could establish a generalized policy or practice of discrimination, they still would not have established that the policy was implemented (and, thus, that Avis actually intended to discriminate) in their individual cases.

Second, and more important, the relief to which individual plaintiffs were entitled after a finding of a pattern or practice of discrimination in Teamsters (and in all subsequent cases employing the Teamsters rationale) was equitable in nature. Teamsters concerned awards of seniority to members of the putative class. Back pay has also been characterized as an equitable form of relief. See Holmes, 706 F.2d at 1152 ("[A] demand for back pay is not in the nature of a claim for damages, but rather is an integral part of the statutory equitable remedy.") (quoting Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1125 (5th Cir. 1969)); Allison, 151 F.3d at 415 ("Back pay, of course, ha[s] long been recognized as an equitable remedy under

---

[20] See supra Part III.A., listing some of the many legitimate reasons why Avis might choose to deny a corporate account to a particular applicant, or terminate an existing account.

Title VII."). In the instant case, plaintiffs have prayed for compensatory and punitive damages under section 1981. These forms of relief are anything but equitable in nature; they are, in fact, the very definition of legal relief. The Supreme Court's decision in Carey v. Piphus, 435 U.S. 247, 264, 98 S. Ct. 1042, 1052, 55 L. Ed. 2d 252 (1978), makes clear that in order to receive compensatory damages, individual plaintiffs must prove that "injury actually was caused." This is especially true since compensatory damages under section 1981 can include damages for emotional and psychological distress. See Ferrill v. The Parker Group, Inc., 168 F.3d 468, 476 (11th Cir. 1999).

The Teamsters framework is, therefore, inappropriate in the instant case because the establishment of a policy or practice of discrimination cannot trigger the defendant's liability for damages to all the plaintiffs in the putative class. To establish that they are entitled to compensation, plaintiffs will have to prove that they actually suffered some injury, whether it be emotional or otherwise. The idea that individual injury could be settled on a class-wide basis is preposterous. Plaintiffs' claims for damages must "focus almost entirely on facts and issues specific to individuals rather than the class as a whole: what kind of discrimination was each plaintiff subjected to[, and] how did it affect each plaintiff emotionally and physically, at work and at home." Allison, 151 F.3d at 419; see also Holmes, 706 F.2d at 1156 ("[M]oney damages are

24

directly related to the disparate merits of individual claims and are not generally applicable to the claims of the class as a whole.") (quoting Rosen, <u>Title VII Classes and Due Process: To (b)(2) Or Not To (b)(3)</u>, 26 Wayne L. Rev. 919, 923 (1980)); <u>Bogard v. Cook</u>, 586 F.2d 399, 409 (5th Cir. 1978) (finding that case would probably not have been certifiable under Rule 23(b)(3) if money damages had been sought for each member of the class, because "[g]iven the lack of common questions of fact as to many of those claims, and the unmanageability of the suit had they been included, we cannot believe that the district court would have allowed the claims as part of that action if they had been recognized as potentially possible").

To understand, further, why liability for damages is a necessarily individualized inquiry, we have only to consider the disaster that would befall any class-wide settlement of this case. Suppose that the district court was called upon to approve a settlement fund to compensate all worthy plaintiffs in the class. First, what could possibly be a fair amount for such a fund? $100 thousand? $10 million? $100 million? We have no idea, and neither would the district court. It would be impossible to calculate the sum of damages necessary to compensate all the class members (including a sum of damages representing the mental and emotional distress suffered by all the plaintiffs), because each plaintiff's damages will be dependent on what kind of discrimination the plaintiff was subject to, and what harm resulted. Any

class-wide figure arrived at would not just be a guess at a fair settlement amount; the court might as well come up with ten numbers at random, take their average, square that amount, and add six. Whatever number the court came up with through this "method" would bear just as much a relationship to a reasonable settlement amount as a number arrived at through any other means.

Moreover, how could the court identify individual members of the class who would be entitled to compensation from the fund? Is every Jewish person who has ever been denied a corporate account by Avis entitled to compensation? What if the individual was able to procure a corporate account elsewhere, and therefore suffered no actual damage? What of the Jewish applicant who does not have a "Jewish sounding name" or a "Jewish accent"? We are not even certain what a "Jewish sounding name" or a "Jewish accent" is. But apparently, if an individual plaintiff did not have one or the other, then there is no way that Avis could have identified the plaintiff as Jewish (absent some other self-identification initiative on the part of the plaintiff – there is no allegation that Avis ever actually asked anyone if they were Jewish). Should plaintiffs without a "Jewish sounding name" or a "Jewish accent," therefore, be compensated? All of this goes to demonstrate the profoundly individualistic nature of each plaintiff's claim for damages, and the complete lack of judicial economy in certifying this case as a class action.

IV.

Counsel for the plaintiffs and amici predict that a denial of class certification in this case will mean the end of all disparate treatment class actions in the Eleventh Circuit.[21]  In response to this dire prediction, we find it appropriate to note, in conclusion, what this case is <u>not</u> about.  This is not a case alleging employment discrimination.  Nor is it a case only involving claims for injunctive and declaratory relief.  This is a case in which plaintiffs have sought to represent a class of "thousands" of Jewish plaintiffs who purportedly reside throughout the United States, and who, plaintiffs allege, were all either turned down for a corporate account, given a less advantageous account, or had their account terminated because the defendant discovered their ethnic identity through its practice of monitoring customer calls to identify callers with a "Jewish sounding name" or "Jewish accent."  Every member

---

[21] At oral argument, counsel for the plaintiffs claimed that a decision by this court to decertify the class in the instant case under <u>Jackson</u> would "eviscerate more than 100 years of civil rights cases."  Doubtless, counsel was warning against a return to the Supreme Court's infamous decision to uphold the doctrine of "separate but equal" in <u>Plessy v. Ferguson</u>, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896).  We are mystified as to how our decision to require conformance with the requirements of Federal Rule of Civil Procedure 23 could possibly be equated with the now repudiated <u>Plessy</u> decision.  Given that individual plaintiffs may be entitled to substantial compensatory and punitive damage recoveries should they prevail, the most compelling justification for a Rule 23(b)(3) class action – the possibility of negative value suits, <u>see</u> <u>Amchem</u>, 521 U.S. at 617, 117 S. Ct. at 2246 – is absent in this case.  Once one understands that the issues involved in the instant case are predominantly case-specific in nature, it becomes clear that there is nothing to be gained by certifying this case as a class action; nothing, that is, except the blackmail value of a class certification that can aid the plaintiffs in coercing the defendant into a settlement.

of the putative class seeks compensatory and punitive damages. The idea that proof of a policy or practice of discrimination could establish that <u>every member</u> of the class is entitled to such damages is, given the substantive elements of the underlying cause of action, untenable. Similarly, given that every member of the class will have to prove actual damage in order to receive compensation for their loss, the policy or practice issue cannot possibly predominate over all the other issues in the case that are necessarily capable of only individualized resolution.

Our decision today, therefore, does not represent the end of the disparate treatment class action in the Eleventh Circuit. Today we merely recognize, and not for the first time, that Rule 23 imposes certain requirements on civil rights class actions, just as it does on any other kind of class action. See <u>Falcon</u>, 457 U.S. at 156, 102 S. Ct. at 2369-70. In the future, to determine whether class action status is appropriate, parties should look to the substantive law relating to the cause of action that is common to each class member, including whether the substantive law supports a "pattern or practice" theory of individual recovery, as well as to the type of relief sought and whether that relief is capable of class-wide resolution or is necessarily individualized.

V.

For the foregoing reasons, we find that the district court abused its discretion in certifying a class under Rule 23(b)(3).  We REVERSE the district court's class certification decision, and REMAND for further proceedings not inconsistent with this opinion.

SO ORDERED.